MAURICE HATHAWAY HEDGES, BY HIS NEXT FRIEND, ETC., LEWIS C. HEDGES, AND ELIZABETH HEDGES, PLAINTIFFS, v. IGNATIUS McMANUS AND ATLANTIC CITY AND SHORE RAILROAD COMPANY, DEFENDANTS.

Decided March 2, 1932.

For the rule, *Bourgeois & Coulomb*.

*Contra, Bolte & Tripician*.

Sooy, C. C. J. This is defendants' rule to show cause why verdicts in favor of plaintiffs should not be set aside.

The grounds are four in number and I will first consider the verdict in favor of Elizabeth Hedges and her husband, Lewis C. Hedges, which verdicts will stand or fall as this rule is determined either in favor or against Mrs. Hedges.

The facts upon which this decision will be based will be gathered, mainly, if not entirely, from the testimony of Mrs. Hedges and my first inquiry will be as to whether the facts as gleaned therefrom and thereby do or do not bar her right of recovery on the ground of contributory negligence, thus leaving the question of defendant's negligence for discussion in considering the verdict in favor of Maurice H. Hedges, a boy of nine years of age, and a passenger in his mother's automobile at the time hereinafter dealt with.

Does the testimony of Mrs. Hedges disclose that she contributed to her injuries in such a manner that had she not been negligent she would not have been injured by the negligence of defendant? Could she, by the exercise of reasonable care on her part, have avoided the collision complained of, notwithstanding defendant's alleged negligence?

The collision was between a trolley car of defendant (operated under a steam railroad franchise) and a Ford sedan owned and operated by Mrs. Hedges at a point in Northfield where the railroad tracks cross Mt. Vernon avenue. This is an unprotected grade crossing, Mt. Vernon avenue running, generally, north and south and the trolley tracks east and west. Mrs. Hedges approached the tracks from the south and was proceeding north. The trolley was coming from the west and proceeding east. The right of way of the defendant is fifty feet wide. Mt. Vernon avenue is thirty-six feet wide and the crossing is fifty-two feet wide.

Mrs. Hedges lived on Mt. Vernon avenue, a block or more north of the crossing and had crossed it many times and knew that cars used the tracks on a frequent schedule and was well acquainted with the character of such obstructions as might impede her view as she approached from either side. She was bringing her children home from school. It was daylight. Mrs. Hedges turned into Mt. Vernon avenue from Main street and proceeded toward the tracks. On her

left, to the west, was Zion road about one thousand and seventy-five feet away and at this point, Zion road, the defendant railroad company maintained a passenger platform and building and it was from this direction and point that a trolley car was approaching.

Just what Mrs. Hedges did towards making observations prior to the time when she came to a dwelling house situate at the southwest corner of Mt. Vernon avenue and the right of way is not of great importance. She says she made observations but, be that as it may, her conduct nearer the tracks is the test of her right to hold the verdict.

Mrs. Hedges says that when at this house (southwest corner above mentioned) she looked toward Zion road, "I observed all the way down, I didn't see anything." At this time, then, she must have been beyond the point where this house was an obstruction to her view otherwise she could not have seen "all the way down." Zion road, as has been hereinbefore stated, is about one thousand and seventy-five feet to the west of Mt. Vernon avenue.

Mrs. Hedges proceeded from this point in Mt. Vernon avenue (beyond the house on the southwest corner) without seeing the oncoming car until just before she was struck and when she saw it she attempted to turn her car to her right in order to avoid it. She was too close to stop her auto. She says, "I could have stopped but it would have stopped me pretty close." "Q. Why didn't you stop? A. It is rather hard to tell why I didn't. When you are caught so quick like that you use your mind. You think something is coming on you—and—I don't know—— I just wanted to get away."

Mrs. Hedges, with reference to the southwest corner house obstruction, says that she knew of this obstruction to her view "as long as I have been driving there." "Q. Then when you came to that you realized that the house that you were approaching would obstruct the view of the approaching train, didn't you? A. Yes."

Mrs. Hedges endeavors to explain her inability to see the oncoming car by saying that there was shrubbery of considerable amount and heighth growing on the right of way

and that the trolley wire poles were located and staggered in such a way as to interfere with her view. A photo marked in evidence shows this shrubbery and the jury would not have been warranted in finding that it did in fact obstruct her view. The exact location and size of the poles were fully given and refuted her claim in this respect. The evidence of the engineers, as to distances—one for the plaintiff and one for the defendant—is in substantial agreement.

The distance from Zion road station to the whistle board is two hundred and five feet and from that board to Mt. Vernon avenue nine hundred and fifty-eight feet.

Mr. Raub, an engineer for the railroad, made observations as follows:

Measuring from the south rail twenty-four feet south he said a person had a view one thousand four hundred and eighty-three feet down the track.

Twenty-five feet (line of southwest corner house) a view of one thousand two hundred and ninety-three feet.

These measurements and observations testified to by Mr. Raub, and not refuted by other evidence show that Mrs. Hedges, at twentyfour feet from the near rail, as she approached it, had a view down the track of one thousand four hundred and eighty-three feet. At twenty-five feet, along the line of the aforesaid house, she had a view of one thousand two hundred and ninety-three feet. So that Mrs. Hedges, at all times after she reached the twenty-four-feet point, had a view to the west down beyond Zion station. The trolley car stopped at Zion station for a passenger, started up and was proceeding toward the scene of the collision and Mrs. Hedges did not see it until too late to avoid a collision. She is quite evidently not quite sure of her speed as she approached the crossing. She says that after she passed the house she brought her car to a creep and then started again to cross. See pages 102, &c.

"Q. Then we are to understand that when you were beyond the northerly line of the little house next to the railroad track your car was barely creeping and then this trolley came on at a terrific rate of speed and you couldn't stop your car

or you couldn't turn it around so as to escape? *A.* I was up too far. *Q.* You were only creeping, why didn't you stop your car? *A.* I did that down here, and I was starting again to cross the tracks. *Q.* Then after you came to the northerly side of the house you brought your car practically to a creeping motion, you looked and didn't see any railroad car approaching, and then you started your car up again. Is that right? *A.* Yes. *Q.* And when you did see the car it was so close to you that you could not stop your car again, and then you tried to turn it around to the right? *A.* As far as I remember. Things are rather hazy like that. I saw him and he hit and that is all I can tell you."

Then follows a reiteration by Mrs. Hedges of her knowledge of the danger at this crossing, her knowledge that the house obstructed her view until she got beyond it at a point twenty-four or twenty-five feet from the near track.

If Mrs. Hedges looked after she got beyond the house obstruction she could have seen the approaching trolley for the remaining time it took her to get to the tracks. The car was coming, she had. a clear view for a distance of over one thousand four hundred feet. Her car was traveling at a "creep." The first she saw of the trolley was practically at the moment of impact.

If the verdict in favor of Mr. and Mrs. Hedges is to be sustained it is because the jury had a right on this evidence to say that Mrs. Hedges exercised due care in approaching this place of known great danger. Did the jury have a right to find in her favor under the decisions of this state?

"An automobile, completely under the control of its operator, standing where placed, incapable of exercising a volition of its own, does not present to its driver the perplexities which courts have recognized in controlling a horse-drawn vehicle," and "had Stryker, too, even after starting, looked when looking was effective, disaster would not have overtaken him." *Stryker* v. *Pennsylvania Railroad Co.,* 104 *N. J. L.* 300.

If Mrs. Hedges had looked when looking was effective and had she looked effectively, disaster would not have overtaken her.

In the Stryker case, Mr. Justice Lloyd cites with approval *Baltimore and Ohio Railroad* v. *Goodman,* 4 *Sup. Ct.* 632, and quotes Mr. Justice Holmes as follows: "When a man goes upon a railroad track he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must stop for the train, not the train stop for him. It seems to us that if he relies upon not hearing the train or any signal and takes no further precautions he does so at his own risk. If at the last moment Goodman found himself in an emergency it was his own fault," &c.

Mrs. Hedges, at the last moment, saw the trolley. It was too late either because she did not look when she says she did or because she did not look with seeing eyes.

*Pennsylvania Railroad Co.* v. *Righter,* 42 *N. J. L.* 180, as far back as 1880 declared the law to be:

"It is a primary rule of legal caution that a person about to cross a railroad is bound to use his eyes and ears, and to guard against the approach of trains by looking each way before crossing." And "the failure of the company to provide or give a statutory signal will not relieve a person from making this observation, if he has an opportunity, by a view of the road to avoid the danger." And in the same case Mr. Justice Reed, quoting Dr. Wharton, says: "If a traveler, by looking along the road, could have seen an approaching train in time to escape, it would be presumed, in case of collision, that he did not look, or, looking, did not heed what he saw."

I repeat that if Mrs. Hedges looked as she said she did, she should have seen that which was obviously in range of her view—the trolley car—she is either mistaken in her testimony that she looked or else it seems to be clear that she did not heed what she saw. It was her duty, under the circumstances in this case, to have had her car under control so that she could have stopped it. She failed in her duty and, at least, contributed to the cause of her injuries with the result that the rule must be made absolute as to Mr. and Mrs. Hedges.

The negligence of Mrs. Hedges, in this respect, was not attributable to her son, the plaintiff, Maurice, and he himself was not guilty of contributory negligence. May his verdict stand? It may if the plaintiff has established by the greater weight of evidence that defendant failed to give the statutory signals. Did the evidence on this phase of the case justify the verdict in favor of the boy? If the evidence presents a factual situation so that the minds of reasonable men might differ, it was for the jury and their verdict must stand and that even though the court might have arrived at a different conclusion had he been a juror.

I have carefully reviewed the evidence on this phase of the case. For the plaintiff, testifying against the giving of signals, are two passengers in defendant's trolley, two young ladies standing near a house over one hundred feet from the crossing and the plaintiff herself. For the defendant, there is a greater number of witnesses who testify that the statutory signals were given. There is some confusion as to just when and where the whistle was blown and whether, if blown —before the accident—the statutory signals were given or not. The jury saw the witnesses, heard their testimony, judged its truthfulness and the opportunity the witnesses had to hear and were in position to determine whether these witnesses were confused as to when the signals were given and whether the statute was complied with. They have found against the defendant and the testimony of plaintiff's witnesses is of such force, that I am unable to say that the verdict of the jury, in this respect, manifests either mistake, passion or prejudice.

The result is that the verdict in favor of Mrs. Hedges and her husband, as an individual, will be set aside and the verdict in favor of Mr. Hedges as next friend of Maurice Hathaway Hedges will stand.